Thank you. I'm the advisor of the Pink Book Council for the House of Warren. This council is here in, I guess we're on the phone with Brian. Is Ms. Collins here? Ms. Collins, are you aware of the situation that Mr. Daritani initially warned us that he was going to have trouble getting here? We asked him to come. He got as far as the Chicago airport and he was then going to be deferred to St. Louis. And I was called late last night by Mr. Bradley, who had counsel on the phone. He said he could try to get here by the flight through St. Louis. The problem would be that that could get delayed or canceled. And then at that point he said, no, tell him to go home and we'll try to do this by telephone. Is he there now? Yes. Okay. Mr. Daritani, are you on the line? I am here, Your Honor. Great. You can hear me okay? I can hear you. It's a little bit light, but I can hear you. All right. I'll try to speak up a bit. Just explaining to Ms. Collins, who is here in court, what got us into this unique kind of situation. So Ms. Collins, at that point I suggested to Mr. Bradley that he tell Mr. Daritani to just go home rather than trying to roll the dice and get here via St. Louis. He said at that point, and I'm going to ask again to make sure that that's still his understanding, that he had no objection to your being in court and him appearing on the phone. Initially I was a bit concerned about that. It clearly won't make any difference in terms of our giving you both the same ear, but I didn't want there to appear to be an advantage with your being here. It was my understanding that Mr. Daritani was not objecting to that. Are you still okay with that process? I am, Your Honor. Okay. If at any time you can't hear anything, let us know and we'll try to adjust the mics or whatever. It is a little bit difficult to hear. Maybe it would be better if I just picked up the phone. I'm not sure. I have you on speakerphone. It always is better off speakerphone. For me. You don't have mics there, but I can tell you what's happening with our lights here. Do you want to go ahead and give him the screen light to start? I'm sorry. Can you hear now, Your Honor? I can hear you fine. Is this any better hearing us? A little bit. Okay. I tend to mumble and speak quickly anyhow. I'll try to slow down and use my best elocution. Okay. Very well. Thank you. Whenever you're ready. Oh, I see. I'm sorry. Members of the Court, good morning. May it please the Court. My name is Jay Paul Deartani, and as you know, I represent the plaintiff appellate in this case. Ms. Collins, thank you for your indulgence, and I truly am sorry again that I couldn't be there in your great city. I tried every way I could possibly. There are three issues in this case, which I think are simple and clear in many ways. The first issue is whether a state created a danger when it gave a false document to foster parents and then placed a sexual predator in a state-licensed foster home. The second issue, of course, is whether the state had a special relationship with the foster family. And the third issue is whether plaintiffs should be allowed to amend at this point of the litigation. Right now, without the amendment, you're alleging that the state knew of J.O.'s background and proclivity for sexual abuse. I'm not sure if you're using the term sexual predator or not, but you're alleging that they were aware of that and that they did not disclose. Are you also alleging, without amending your complaint, that they deliberately misled by saying that he was basically safe and had no history of abuse? Well, even without amending the complaint, and I understand the lower court's concern or many things that are buried in the original complaint, which are hopefully not buried in the amended complaint, but in paragraphs 57 through 60, read as a whole, it does basically allege that the defendants knew of J.O.'s sexually abusive and violent behavior and that it posed a serious risk, and they went ahead and placed him in that home. Okay, what is your best case, given what the Cheney says and the limitations on the state-created danger doctrine and the stringent requirement of shocks to conscience? And we can come back to that, because you may not be arguing that shocks to conscience is the correct test here under these facts. But what is your best case? The best case for shocking to conscience, Your Honor? For the entire application of state-created danger to these facts? The best case for the state-created danger is basically Nip. And I think our case is stronger than, if I'm pronouncing that case correctly. In that case, in Nip, the police abandoned a drunken woman. And a man and a wife were walking down the street, and basically the police stopped them and allowed the man to go forward and go home and left the woman there, and she sustained injuries, inclusive of a brain injury from the cold. I would argue, and I certainly think the defendant would have argued in that case, that it was passive conduct, not affirmative conduct. If in Nip, the act of getting involved in that couple's care at that point and then walking away can be considered an affirmative act, which I would say it is, then certainly knowing two things here that occurred, placing a child or a teenager in a home with a 9-year-old that they know is a predator or sexually aggressive and abusive under the original complaint, and giving a false or misleading document to that parent are two bits of conduct which are active conduct which, at least under Compu Sacramento v. Lewis, shows a deliberate indifference to the family. But in Nip, the situation in Nip where a night barber is pronounced was such that when the police allowed the husband to proceed and the woman was allowed to remain behind and proceed on intoxicated, there was really no way that the husband could intercede because he'd left to protect the wife. She couldn't protect herself because she was incompetent, apparently, at least intoxicated. Here, wouldn't common sense suggest that if you have a stranger coming into your home, a strange kid coming into your home, you're going to take certain precautions because you don't know who this kid is, he's been placed there by the state, you've got two minor children of your own, so you're going to take certain precautions to make certain that your own children's safety is not jeopardized by this placement. So why would that not be a different situation for state-created danger purposes than we have in Nip? Well, I think that in Nip, one could argue that the husband could have come back for his wife or not left his wife and, you know, it didn't focus, the court didn't focus on the husband's conduct so much as it focused on the police officer's conduct and therefore the state's conduct. And I would say even if one could argue that the parents could have done more without the direct information, without knowing, and given a document, I would say that they would have no reason to suspect that this child is a sexual predator. Certainly, and I understand the court's question in terms of, certainly when you take a foster child in the home, you have to take ordinary precautions and so forth. But, I'm sorry if I, did I interrupt? No, you didn't. Go ahead. I guess my final thought on that point was that had they known, certain conduct could have been taken by the parents, perhaps not allowing them to be unsupervised in their bedroom or things like that. But when you have two children and you are perhaps downstairs cooking or doing whatever the husband or wife might be doing at the time and you're allowing your children to play video games upstairs, you think only that is going to go on rather than the conduct that did go on because you don't have any notice of it. So, I think that when the court talked about the conduct, it's really talking about the police or the state's conduct. In this case, I would hope that we look at what the state should have done in their affirmative acts in this case. Okay, you mentioned Lewis. I think you mentioned Lewis. Is the inquiry here under the second prong of state-created danger shocking the conscience? Is it deliberate indifference? Is it willful neglect? Is it willful blindness? Is it actually shocking the conscience? In other words, a lot of different conduct can rise to the level in a certain circumstance to shock the conscience. And that depends, as the court said in Lewis, on the totality of the circumstances and whether or not there's an opportunity for reflection. The extent to which there is an opportunity of reflection will lower the threshold for what conduct or what amount of neglect will shock the conscience. What are you arguing here? Are you saying that it's actually shocking the conscience? Or is it just deliberate indifference? Or what level of culpability do we have to get to for the test to apply? Well, that's a terrific point in the sense that Talia Sacramento v. Lewis did say that the standard is deliberate indifference. It seems to hold a threshold standard of at least deliberate indifference. Unfortunately, I think the defense counsel, though wrote a very good brief, misstates the standard in that we must show a knowing violation. And the words in the court in Sacramento v. Lewis referring to a deliberate indifference to the conduct and looking at the whole is really what we're talking about here, although I would say, especially under our amended complaint, knowingly giving a false or misleading document to a foster parent, and even in the original complaint, and knowing that J.L. was a predator or violent, and three, placing that predator. And, Your Honors, I would say that the most important aspect here is placing a known predator or a sexual offender or even somebody that you know to have violent behavior in the home of a nine-year-old is shocking. It's just that plain and simple. We don't have to show an intense tanger, and certainly one would argue, and I'm certain the defense did a very good job at arguing that Ms. Scalco and the other employees of ECOCY did not intend to injure the plaintiff. But when extended opportunity to do better is teamed with protracted failure to care, that indifference is truly shocking, and we at minimum have that here. Well, following along on Judge McKee's question, I take it your position is that the state had the luxury of time to deliberate here, right? It does, Your Honor. Certainly, if you look at the time frame that they had and even the period of time in which the child was a part-time resident in the foster home and before he even became a more full-time resident in the foster home, that gave them a considerable, we're talking over, I believe, over a year, factually, in which they had that opportunity, as the court said in Sacramento, they had, call me in Sacramento versus Lewis, they had that opportunity to do much better. And, you know, as we've alleged, even in this complaint, in paragraph 58, 59, there is a document in which they had which clearly indicated to the plaintiff that, by omission at least, but certainly we would say by commission, by giving them the document, that clearly led them to believe that this child was not a sexual predator. That's an assurance. In fact, when your clients picked up the teenager, the request was made, is there any reason why we shouldn't take him home? And there was an assurance given no, correct? That's correct. I believe we've alleged that in both the original complaint and what we seek to make more clear in the amended complaint, is that they had asked whether or not he was a danger, and the answer was no. But earlier this year, in the Yee case, we held that a mere assurance cannot be an affirmative act for purposes of the state-created danger doctrine. How do you get around Yee? Well, I get around that case by simply going back to it's much more than assurance in this case. It isn't simply stating, well, we don't know or, you know, we think that this child is, I think the words was, a good child. We have alleged, even in the original complaint, three separate things. That they knew, and they deliberately misrepresented, and even if you want to say Yee, that was the same sort of situation. Then they went that extra step and gave a document, and then they went that third step, which is most important, and they put him in this home. I'm sorry, Mr. Zanger, your yellow light is on. I'm going to cut off, but keep going, so that you can find your own response. The yellow light just came on. I'm sorry, you want me to continue with the... Go ahead, Yee, your yellow light is on. That gives you three more minutes. Okay. Cut you off. Well, here, just in sum and substance, I think that the cases in which defendants cited, none of the cases, if we just look at the situation of whether the state created a danger, there's no case in which would not allow, either under our original complaint, as perhaps inartfully drafted, or rather vaguely drafted, as one would want to say, or any proposed amendment complaint. We do state those three circumstances, which does allow for a state-created danger. This is, and I just wanted to add to that fact, is they created the danger because, in addition to the three things that they did, placing a child, knowing that child was a problem, and giving a document to the family, they had given the license to this foster family, and there was a relationship, and that goes along with the second part of our argument, which is whether there was a special relationship here. And I know, and I certainly am going to anticipate the question, which is that aren't we just, aren't you expanding the law here? And I'm up to Shaney or the other cases on this, and I would say that it's not. It's simply a logical corollary that when you have a situation where a foster family is being licensed by a state agency, there is a special relationship to that entire family. Well, the relationship extends, though, to the foster family's children, not the foster child who was put in the home. The cases that have found the special relationship have looked at the foster child, not the one who's placed, but the parents of the foster, the child of the foster parent. That's the nature of the special relationship. And I understand the point. If the kid is being placed, that's where the special relationship is. Here you're trying to expand it not to the kid who's being placed. Well, you might have an argument under our case law that there's a special relationship, and you may well be right, but to the child in the home where the foster child is being placed. And there's no case that I know of that I've ever found that would take it that far. And Your Honor is correct in one sense. I prefer not to use the word expand. I prefer to use the term that it's a logical corollary. Here you have, if you have all of these cases which say that there's a special relationship and it goes way beyond the shaming decision, which is probably about nothing. Don't do that. But you have a special relationship with a foster. Whoa, time out. Mr. D'Antoni? I'm sorry? Your red light just came on. We need to put something in the chambers so I can give you the time out sign or something. But go ahead and finish your response, and we might have additional questions, but just so that you know your red light is on. Oh, okay. Thank you. Thank you, Your Honor. I wouldn't argue that it was an expansion as much as it's a logical corollary that the entire family must be taken as a whole. You can't distinguish. It would be inequitable to state that only a foster child receives protection, and yet imagine you're placing a predator in a home and there's no protection. Well, why would it? Because the foster child is the one who's the ward of the state. The child who's in his or her own home with his or her own parents that the child can still look to for protection. That child is not a ward of the state, and the special relationship goes to those wards, if you will, that because of their relationship to the state and the dependency on the state, can't fend for themselves, whether it's somebody who's been involuntarily committed or they're in a prison. But in this situation, what would KB do? He can't fend for himself. And I would say the special relationship is created as the whole family. KB goes to mom or dad. KB goes to mom or dad. KB goes to his mother or father. That relationship is still there. That relationship has not been negated or weakened by the state. The natural relationship that he has for protection is still in place, absent the state action, whereas in Deshaney and states like that, the natural relationship and the natural ability one would have to protect him or herself is gone because of the action of the state, the interference of the state, and the power of the state. That's what the special relationship arises from. And if you put that on the kid, that doesn't happen. I'm sorry? If you put that on the kid who's being placed, the foster child, you don't have that same situation. I'm sorry, the child in the foster home, you don't have that same situation. Oh, I think you do because we've weakened the entire family unit by placing a predator in a home. And the special relationship, I would hope to argue, is by fact of the creation of the license. So they've changed the family unit. And, therefore, I do think if we want to call it an expansion, you could, but I think it's certainly a logical corollary that the protection would go to at least KB because he's a child in a home and he had no choice under a special relationship where he was going to live. And that was something that the court focused on in the foster family decisions is that the foster child had no choice. But I would say what choice did KB have in this situation? Okay, thank you. Thanks, Gordon. Go ahead. Thank you. Just one more question, Mr. Dertani. Assuming we find that the district court erred in not giving you leave to amend, why should we address the merits of the case rather than just allowing the district court to do that in the first instance? Why should you not address the merits of the case? Either way. Well, I think that it's at a very early stage of the litigation and certainly even in the case of, I believe it was one of the cases, Sanford v. Stiles, there was a summary judgment case in which the court had depositions and facts which showed facts which a counselor did not conduct certain actions. Here we're at such an early stage of the litigation and when we go back to the standard that must be applied, it's certainly not beyond doubt that we can prove facts. And I would say that under our looking substantively at our amended complaint and even at the original complaint, we've set forth the minimum requirements. I think that it's the court's obligation, if you will, to allow us to go forward and perhaps we may be back with summary judgment by defendant. Maybe there will be facts in which come out which would cause us to amend the complaint further or to dismiss or to go all the way to jury. But we're at such an early stage of the litigation. I would say, at minimum, under Nix v. Welch, even where we, in that case, they didn't do all of what they should have done, the court, I would say, bent over backwards, this court, in allowing amendments. Thank you. Thank you, Your Honor. Okay, Mr. Collins. May it please the court, I'm Pam Collins, and I represent the Erie County Office of Children and Youth. Excuse me one second. Mr. D'Artagnan, can you hear her okay? I can. I'll be straight in a bit, but I can hear. Okay. Thank you. I'll try to speak up.  Okay. Thank you. Can I ask you a question right off the bat? Certainly. Something not in your brief. There's one defendant left in this appeal, right? Your client, right? My client, correct. Is the Erie County Office of Children and Youth Services, right? That's correct. Well, I represent the Erie County Office of Children and Youth Services. As well as their employees. It's unclear from the appeal notice that the plaintiff filed whether or not plaintiff appellants attended to include the employees in the appeal. However, I thought his brief said that that's part of the state court case and not this one. That's what I thought, too. I thought it was just E-C-O-C-Y. Well, actually, Your Honor, I think what is in the state case is the other defendants, Elizabeth Mallory and Harbor Creek Youth Services and Merit Lynn Kleiner, and those individuals are all being pursued by the plaintiffs in state court in Crocker County. None of the Erie County Office of Children and Youth Employees are included in that action currently. Well, my point is, based upon who your client is, I didn't see anything in the briefs about municipal liability under Monell v. Department of Social Services. Was that a deliberate decision? That's correct because it's my understanding that the plaintiffs were not appealing any of the lower court's determinations that, in fact, the E-C-O-C-Y is immune under the Political Subdivision Tort Claims Act. So the only issue here is the issue concerning 1983. Okay. How would the state-created danger doctrine apply here? The state-created danger doctrine does not apply here, and it does not apply for two reasons. I think the lower court correctly focused on their four prongs in the test. The lower court focused on the second and the fourth prongs. The second prong requires that the action shock the conscience of the court. Now, how do you know? Maybe Pittsburgh is different than Philadelphia. Maybe you folks are used to things that we're not. I used to hear it in serene, laid-back Philadelphia. But if the allegation is that they, and I may get confused between the complaint and the admitted complaint. I'm going to try to keep this to the complaint, not the admitted complaint. But the allegation is that there is a sexual predator that the state knows about, and the state places that sexual predator into a home knowing that there are two minor children in that home and doesn't tell the foster parents that the kid that they're getting, not only doesn't tell the foster parents that the kid they're getting is a sexual predator, but when asked specifically by the parents if there's any reason why we shouldn't take this adorable young child with this wonderful, gleaming smile, the state says, no, no reason. And so they take the wonderful young child with a gleaming smile who's a sexual predator, put them in their home, and then to no one's great surprise, I guess except for the people who say that we put them there, there's an allegation of sexual abuse, several allegations of sexual abuse. That doesn't shock your conscience? Well, I think we need to distinguish here from the result and the action. And the actions in this case that are alleged are not actions. They're in fact omissions. What about placing the kid in the home? The foster family applied to take a foster child into their home. They went through a long process where they discussed this with various employees of my client and various other individuals at these other agencies. The act is not the placing as alleged by the plaintiffs. The act is the fairer to inform them of what they knew. It's an act of omission. How is NYPE, if you write about that, that we were wrong in NYPE? No, I don't think you were wrong in NYPE. In NYPE, the police specifically detained this woman who was on her way home to be safe with her husband. Although she was intoxicated, he apparently was going to escort her home so that she would make it safely to her home and not fall and injure herself. After the police detained her and separated the couple, they left her to fall down a bank. But she didn't fall down while she was in custody. She fell down while she was walking home on her own. They sent her home. They did not escort her back to her home. They detained her. And that's not analogous to placing someone in someone's home? By the action of the state, placing a kid in someone's home is not analogous to the police and NYPE? I don't believe so, Your Honor, no. I believe that what the plaintiffs have alleged are acts of omission. If you're right about that, why isn't the kind of omission we're talking about, an omission coupled with an affirmative act, and you can argue about what caused that affirmative act to take place, but here we at least have an omission plus an affirmative act. Why isn't that still the kind of state involvement, if you will? I'll use that term instead of act. Why isn't that the kind of state involvement which could satisfy the fourth point of the State Petity Injury Action? The case law makes no room for a combination of acts. What case excludes the possibility for looking at it that way? I don't think any of the cases have actually discussed that, but if you look at the cases on which the lower court relied, failure to enforce conditions of a parole in Bright, failure to stop a student's suicide in Sanford. This is very similar. In Bright, rather than failing to enforce the conditions of parole, the parole officer had somehow told the family next door that it was okay for that, this is a hypothetical, I'll probably abandon halfway through it, but the state had probably done something to convince the family next door that it was okay for the sexual offender who was under parole supervision to move in as a boarder to their home. They hadn't even placed him in there, but said it's okay, you can let him move in, he's under our supervision, what could possibly happen? As far as we know, he's safe, you can let him move in. Again, I think that goes on to being an assurance as opposed to an affirmative act. We have case law in the unit that says an assurance, and an assurance is not an affirmative act. The case law that says that kind of an assurance, an assurance which creates the platform in which the danger is going to manifest itself, that kind of an assurance cannot satisfy the fourth prong of the test. Is there any case that says that? I don't believe there is, Your Honor. Let me ask you something. Is there a reason, you obviously are not your client, but is there some reason that you know of why they couldn't tell a family? Is there a medical records reason or any other reason why they couldn't tell a family? It's our belief that these individual parents, they were told and they were told again. If I may, there was an administrative law proceeding after. They were decertified. Yes, they were decertified, and in conjunction with that, the administrative law judge specifically found that the Bryans were advised that this foster child had had sexually inappropriate behavior in the past, and that, in fact, they should put an alarm on his bedroom door. That's the summary judgment motion, I think, right? Correct. Those facts are not before us. They're not part of the record. However, that is our position. And on this record, Counselor, isn't it clear that the district judge erred in not giving your adversary leave to amend under the Grayson decision? Didn't we hold in Grayson that if a district court is going to dismiss on a Rule 12b6 motion that it needs to offer the plaintiff the opportunity to either amend the complaint or stand on the complaint as drafted? Well, it's my understanding that that only applies to situations where the complaint is dismissible for being factually nonspecific. If you look at the case law relative to that, the cases where they have, for example, the Nicks case, that complaint was about the Fair Debt Collection Practices Act. And in that case, the complaint simply alleged that the defendant's actions violated the act and they embodied violations of the act. So those are very nonspecific allegations. In this case, the plaintiff went to great pains to make a very factually specific complaint. What about Grayson? What did we say in Grayson? I don't have that case with me, Your Honor. But that's my understanding of the rule of law. But you're citing Nicks for that rule of law, not Grayson. Correct. That's correct, Your Honor. Wasn't that the nature of the 12b6 dismissal law? Shouldn't someone be allowed to amend there? To either amend or stand on it? For two reasons. One, just out of fairness, if it's going to be dismissed for a state of claim, you've got to give the person the opportunity to want to revoke themselves for a state of claim and also for appellate jurisdiction. If they want to stand on their complaint as it's drafted, then it's a final order and they can argue on appeal, which they can't do if they have an opportunity to amend and take an appeal that's interlocutory. But doesn't it just make sense that someone should have an opportunity to amend a complaint when the reason for dismissing it is that there's no conceivable set of facts which would allow them to state a cause of action under the law? I'm not sure exactly your question, but... If a complaint is being dismissed under 12b6, it doesn't state a cause of action. So basically the district court is saying, okay, so what you said is perfectly true, but you haven't said anything that a court can be cognizant of because you haven't stated a cause of action. Assuming all this is true, why shouldn't the person be able to come back and say, well, then let me redraft it so that I can put in the complaint facts that if I can prove them, would state a cause of action? Why shouldn't they be given that opportunity? Well, I believe the court has the discretion to determine whether the complaint was factually specific enough to make the determination as to whether there might be a set of facts that could state a claim, could be granted, and it's in the court's discretion to determine that based on the facts alleged and based on the information in the complaint that there is probably not a set of facts. Well, that's a futility determination, is it not? The district court has the ability to say that any amendment would be futile. I agree with you there, but the district court didn't do that here, did it? The district court did not specifically state that in its opinion relative to the ECIC. Isn't that what Grayson says? The district court must either grant leave to amend or make a futility determination. Well, it's my understanding that it involves the factual specific issue. I'm not even sure the district court here looked at the amended complaint to say that, okay, I've looked at the amended complaint and it is futile. There's no sense in amending it because this is not going to help you. I'm not even sure it did that here. The plaintiffs did not move to amend the complaint. It wasn't filed. It's filed on appeal for the first time. It's not been filed on appeal, so the district court has never seen it. Okay. Anything else you want to argue? Ms. Collins, your time is still running. You still have some time. I'm not suggesting you use it unnecessarily, but if you want to. I'd like to ask the same question I asked your adversary. Assuming that under Grayson we find the district court should have allowed an opportunity to amend, do you think we should address the merits of the state created danger doctrine or just send it back down and allow the district court to do that in the first instance? I would believe that it would be the lower court's job to address that. I'm sorry, I didn't hear you. I would believe that it would be the lower court's job to address that. Okay. I would simply state in closing that relative to these affirmative acts, this plaintiff wishes to recharacterize the offering of this form, which is mentioned in the original complaint but very briefly, as an affirmative act in handing this form over. But, again, the form is an act of omission because what has not been disclosed is not on the form. If they just handed it over in the form, there would have been no problem. They handed it over to the kid. That's what the problem is, not the form. There's some problems perhaps with the form, but the real problem here is that they gave him J.O. Well, again, Your Honor, we believe that it's an act of omission. It's quite an omission. You missed your kid who's going to live with you. It's not really an act. It's just an omission. Okay, thank you. Thank you. Did you reserve rebuttal, Mr. Berrettani? I'm sorry, Your Honor, I just missed the last second. Did you reserve rebuttal? I would like a moment of rebuttal, if I could. Okay, well, that wasn't the question. The question might have liked it, but did you reserve any? Oh, yes, I do, Your Honor. Did you? You didn't. No, I'm being told by the inquirer and my colleague to the right book, with whom I trust, that he didn't reserve any. If there's anything else you want to add, you can do it in a 28-J letter and send Ms. Collins a copy so that she can respond to it. I see. Okay. Okay, good. Thank you very much. You're in Pittsburgh now? I'm sorry? No, I'm actually in Chicago now. Oh, okay, all right. That's why you are coming from Chicago. Yes, and I wish I could have been there before you. It would have been a beautiful court to be in. I appreciate that. Thank you. What is the weather like in Chicago? What's that? What is the weather like in Chicago? Well, finally it's sunny. There's a lot of snow on the ground, but finally it's sunny. And finally the planes, I hear the planes are finally moving for the poor folks that are going home and so forth. Okay, all right. Well, thanks for allowing us to pat you in this way. Ms. Collins, thank you very much for your indulgence. Thank you. Thank you, members of the court. Thank you. We'll take a vote under the advisement. Next case, you want to take a break? No, I'm good. Next matter is Kotak versus Aguirre or Aguirre? Aguirre. Aguirre. Aguirre.